**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------------

DENNIS S. HERSCH,

                       Plaintiff,

      -against-

ANDREW T. FRANZONE and
FF FUND MANAGEMENT, LLC,

               Defendants.

-------------------------------------------------------------------------------------

Index No. 1:20-cv-09047

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE ..........................................................................6

PARTIES .............................................................................................................6

FACTUAL ALLEGATIONS ...............................................................................7

FIRST CAUSE OF ACTION .............................................................................21

SECOND CAUSE OF ACTION ........................................................................23

THIRD CAUSE OF ACTION ............................................................................23

FOURTH CAUSE OF ACTION .........................................................................24

FIFTH CAUSE OF ACTION ..............................................................................27

SIXTH CAUSE OF ACTION .............................................................................27

PRAYER FOR RELIEF ......................................................................................28

JURY DEMAND .................................................................................................29

Plaintiff Dennis S. Hersch ("Hersch"), by and through his undersigned attorneys, alleges against Defendants Andrew T. Franzone ("Franzone") and FF Fund Management LLC, a Delaware limited liability company (the "GP"), as follows:

## INTRODUCTION

1.     This is an action for fraud, breach of duty, and breach of contract by an investor in a private investment partnership, FF Fund I, L.P. (the "Fund"), against the partnership's founder, Defendant Franzone, and the partnership's sole general partner, FF Fund Management LLC, which on information and belief is an entity Franzone owns and controls.

2.      The Fund is an insolvent, bankrupt shambles.[1] While Franzone sold the Fund to investors as a vehicle that would pursue a proprietary trading strategy around preferred stocks, options and other highly liquid securities, and while he collected, on information and belief, more than $40 million from investors, the Fund entered bankruptcy with no liquid, exchange traded assets and less than $1 million of cash. Instead, the Fund then consisted, and still consists, largely of a pile of illiquid, non-tradeable privately held shares in early stage or start-up companies, minority interests in real estate partnerships, and unsecured promissory notes with long term maturities reflecting dubious loans to questionable borrowers. Worse, the Fund owes millions of dollars of unfunded and unfundable capital call obligations to its investment counterparties, and more than a million dollars to the bankruptcy professionals who are administering its Chapter 11 case.

3.     After almost a year under the bankruptcy court's protection, the Fund's Chief Restructuring Officer "has not been able to value any of the investments or assets of the Debtors,

---

[1] The Fund is a debtor-in-possession in a case under Chapter 11 of the federal bankruptcy code (Case No. 19-22744-BKC-LMI) pending in the United States Bankruptcy Court for the Southern District of Florida.

nor has he confirmed or been able to confirm that the value of such investments or assets were accurate or were accurately reflected on the books and records of [the] Fund or [its principal asset-holding subsidiary] prior to his appointment."[2]

4.     In short, the Fund is wrecked, having never executed the proprietary trading strategy (apparently conjured) that Franzone fraudulently misrepresented to be its principal objective.  The Fund also is looted because Franzone artificially inflated the value of some of its largest assets, triggering unwarranted compensation to himself, indirectly through the Defendant GP. And the Fund's administration was grossly mismanaged: despite paying for layers of duplicative administration services, Franzone failed to maintain even the most basic set of reliable books and records for the Fund.

5.     From June 2012 through December 2016, Plaintiff Hersch invested $1.1 million in the Fund, purchasing limited partner interests through his individual retirement account.

6.     From July 1, 2014 to May 1, 2017, Hersch, not in his individual capacity but instead in his capacity as trustee of a New York trust (the "Trust"), made additional investments in the Fund such that the Trust became the Fund's largest limited partner.

7.     In May of 2019, Hersch first learned that Franzone had for years perpetrated a fraud upon his investors concerning the composition and valuation of their investments in the Fund, and otherwise grossly and self-interestedly mismanaged the Fund, including Hersch's individual investments within the Fund, to support Franzone's lifestyle and his personal business of co-owning a car racing team.

---

[2] First Status Report of The Chief Restructuring Officer Soneet R. Kapila, CRO, dated September 9, 2020, filed in the Fund's Chapter 11 case at Docket No. 170, at p. 2 of 14.

8.      Significantly, in July of 2019, days after Hersch requested access to the Fund's books and records, Franzone suddenly informed all limited partners (collectively, the "Limited Partners") that he was causing the GP to wind down the Fund—a transparent attempt to buy time in the face of redemption demands from Limited Partners who had invested approximately 80% of the Fund's invested capital and to maintain control of the Fund in the hope of hiding the full scope of his wrongdoing.

9.      On August 6, 2019, Hersch, in his capacity as trustee of the Trust, filed suit in the Court of Chancery of the State of Delaware (Case No. 2019-0613-SG, the "Delaware Action") on behalf of the Trust individually and derivatively on behalf of the Fund against Franzone and the GP. On the eve of the first deposition in the expedited Delaware case, Franzone caused the Fund to file its bankruptcy petition and engage a Chief Restructuring Officer, Soneet Kapila (the "CRO").

10.     With the Delaware Action stayed as against the Fund and the Bankruptcy Case pending, Hersch, in his individual capacity, now seeks damages against non-debtors Franzone and the GP for substantially the same wrongdoing alleged in the Delaware Action.

11.     From the inception of his management of the Fund, Franzone fraudulently induced Hersch to invest in the Fund based on a strategy set out in private placement memoranda ("PPMs") for the sale of the Fund's limited partnership interests. The PPMs emphasized Franzone's use of partners' capital to engage in trading of preferred stock, options and other highly liquid securities and which strategy allowed only for "investment of a portion of the [Fund's capital] in a portfolio of non-exchange traded assets" to "minimize the . . . volatility and exposure to exchange traded market risk."  December 2014 PPM at 9. According to the PPM dated December 2014, the Fund

3

was to "focus" on the "trading of [option and preferred] instruments" to "maximize liquidity in the portfolio." *Id.* at 4; *see also id.* ("The Partnership places a strong emphasis on . . . liquidity.").

12.     From 2012 through 2018, Franzone repeatedly represented to Hersch, directly and through Hersch's son and investment advisor (Gregory Hersch and Florence Capital Advisors), that Franzone, on behalf of the GP and the Fund, was executing those trading strategies, to which he attributed the Fund's positive performances reported by the GP (and upon which the GP paid itself management and performance fees). Month after month, Franzone would report fictitious monthly gains from trading, stating in words or substance that the current month "has also been tracking nicely as well *on the trading front*" and that the current "monthly return . . . is currently posting a gain . . . ."

13.     During this same period, Franzone also repeatedly misrepresented to Hersch, directly and through Greg Hersch and Florence Capital Advisors, the amount of the Fund's assets under management ("AUM") and the number of the Fund's investors, overstating each so as to mislead Hersch into believing the Fund was more substantial, and more liquid, than it actually was. Franzone also represented to Hersch that the Fund would always be sufficiently liquid to redeem all or a part of Hersch and the Trust's investments on a monthly basis.

14.     By July of 2019, Hersch had discovered, that (i) Franzone had executed no material amount of securities trades for the Fund (other than to liquidate two investments introduced to the Fund by the Florence Capital Advisors), (ii) Franzone instead "invested" the Fund's capital almost exclusively in privately-held companies and ventures of Franzone's friends and associates through undocumented or poorly documented loans and informal arrangements, (iii) Franzone, in bad faith, inflated the value of those illiquid positions so as to artificially inflate management and performance fees allegedly due to them, (iv) Franzone wasted significant Fund assets by paying

4

millions of dollars in unnecessary fees to administrators, auditors and accountants in attempts to obtain referrals of potential new investors to increase management fees; and (v) Franzone ignored formalities between himself, the GP and the Fund and has used the two entities for his personal purposes.

15.     To hide Franzone's abuse of his fiduciary and contractual duties to the Fund and to the Limited Partners, Franzone directed and supervised the GP to breach its duty under the LP Agreement to provide audited financial statements to the Limited Partners of the Fund, including Hersch in his individual capacity, within 90 days of the end of the Fund's fiscal year. Indeed, the most recent audited financial statements that exist for the Fund are for the year ending December 31, 201**4** and the auditors' report thereon was not issued until March 14, 201**8**. Franzone also directed and supervised the GP to refuse Hersch access to the books and records of the Fund as required by the LP Agreement and Delaware law.

16.     In sum, Hersch's investigation revealed that Franzone, both directly and indirectly through his control of the GP, (i) abandoned the Fund's repeatedly-stated investment strategy of trading in liquid securities, (ii) reported fictitious trading profits to the Limited Partners while actually conducting no material amount of trading on the Fund's behalf, (iii) systematically poured Fund assets into undocumented or poorly documented positions in obscure and illiquid private companies controlled by Franzone's friends and acquaintances, (iv) fraudulently collected or accrued management and incentive compensation based on the inflated, unrealized investment valuations and fictitious Fund performance figures, (v) misappropriated or encumbered Fund assets to support Franzone's personal business of owning a professional car racing team and to repay Franzone's personal debts, (vi) paid millions of dollars in unnecessary fees to administrators, auditors and accountants for no Fund business purpose in the blind hope of obtaining referrals of

potential new investors to increase management fees, (vii) breached his duty to provide the Limited Partners with timely audits of the Fund's financial statements and (viii) otherwise grossly mismanaged the Fund and eschewed appropriate internal controls.

17.     Hersch now seeks compensatory damages, equitable relief, and any other further relief the Court deems just and proper.

## JURISDICTION AND VENUE

18.     This Court has personal jurisdiction over Franzone pursuant to N.Y.C.P.L.R. § 302(a)(1) because he is a non-domiciliary who transacts business within New York, and Hersch's claims against Franzone arise out of that business activity.

19.     This Court has personal jurisdiction over the GP pursuant to N.Y.C.P.L.R. § 302(a)(1) because it is a non-domiciliary corporation which transacts business within New York, and Hersch's claims against the GP arise out of that business activity.

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Plaintiff resided, transacted business, was found, or has agents in this District; the Defendants transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## PARTIES

22.     Plaintiff Dennis S. Hersch is a natural person residing in the State of New York. Hersch has been a Limited Partner of the Fund and was a Limited Partner at the time of the

transactions, acts and omissions of which Plaintiff complains herein. He is also the trustee of the Trust, formed under the laws of the State of New York.

23.     Defendant Andrew T. Franzone is an individual who, upon information and belief is a resident of Florida.

24.     Defendant FF Fund Management, LLC is a limited liability company formed under the laws of the State of Delaware. It is the Fund's sole general partner.

25.     Non-party Florence Capital Advisors LLC ("FCA") is an investment advisory firm registered with the Securities and Exchange Commission pursuant to the Investment Advisors Act. FCA and its founder and Chief Executive Officer, Gregory A. Hersch, have acted as an investment advisor to the plaintiff in (among other things) his investments in the Fund and his dealings with Defendants. Gregory Hersch is the Plaintiff's son.

## FACTUAL ALLEGATIONS

### *Franzone's History of Fraud against the Trust, and Hersch therein individually*

26.     In December of 2014, the GP issued a Private Placement Memorandum to potential investors for limited partnership interests in the Fund. On its front page, the PPM describes the Fund as a "multi-strategy investment fund." In the very first paragraph of its Executive Summary, the PPM states that the Fund's "objective is to achieve capital appreciation and current income through multiple and diversified trading strategies."

27.     The December 2014 PPM lists Franzone as the Fund's "Founder & Principal." *Id.* at 12. It touts Franzone as having had over 15 years "developed and refined his trading and investment strategies, especially in the fixed income, preferred stock and options parts of the market . . . ." *Id.* The "Investment Strategy" section (*id.* at 4-9) describes at length how the GP and Franzone would employ investment strategies that utilize "broad base market indexes and ETF [exchange traded fund] options", "high grade-individual option positions," and "preferred stock .

7

. . [in the] NYSE listed universe." The Investment Strategy section also states that, in contrast to the strategy of trading liquid investments, it would "also" invest in "Private/Non-Exchange Traded Investments" to "minimize the . . . volatility and exposure to exchange traded market risk . . .." *Id.* at 9.

28.     In reliance on these representations in the December 2014 PPM and on similar representations by the GP (or its predecessor) both in an earlier PPM and in later communications with Hersch and Gregory Hersch, Hersch purchased $1.1 million in limited partnership interests in the Fund from 2012 to 2014.

29.     In regular email reports to the Hersch, Franzone represented his tracking of Fund returns "on the trading front," the number of "trading days left to go in the month" and the "volatility in the markets."

30.     Franzone compounded his fraudulent misrepresentations about the Fund's trading activity by inviting the Limited Partners, including Hersch, to track the Fund's trading performance in real time via the Fund's investor portal, access to which was restricted to Fund investors. A copy of a representative screenshot from the Fund's investor portal is annexed hereto as Exhibit A.

31.     On the portal, Franzone continuously represented that the "core" of the Fund's "investment program" consisted of "[u]tilizing proprietary pricing models" informed by "the firm's extensive trading . . . experience," which the Fund would leverage to "exploit short, medium, and long-term valuation and volatility inefficiencies [across] . . . exchange-traded preferred stock and option securities." *See* Exhibit A at p. 2." In so doing, Franzone fraudulently misrepresented the Fund's trading philosophy and principles as those that sought to "maximize liquidity in the portfolio" and put "a strong emphasis on risk management, capital preservation, and liquidity." *Id*. Both statements are now understood by Hersch to be completely fraudulent and

only made by Franzone to induce Hersch and the other Limited Partners to further invest into the Fund, and not to redeem their investments.

32.   Each month, Hersch received from an administrator for the Fund, Unkar Systems, Inc., a single-page "Account Statement" stating the "Year to Date" and investment "Inception to Date" returns on his and the Trust's capital investments in the Fund. The Account Statements did not show any Fund investments; all they showed was "Profit or Loss" for the period in question. The Account Statements never showed a losing year and, as of April 2019, purport to show that Hersch had gained $649,515 since his first investment, for an ending account value in April 2019 of $1,749,515.

33.   All the while, Franzone regularly and repeatedly misrepresented the Fund's AUM to Hersch and Gregory Hersch, inflating that figure to mislead Hersch into believing that the Fund was larger than it actually was and to induce Hersch to invest more of his and the Trust's assets into the Fund, and to prevent Hersch from seeking to redeem either investment.

34.   Hersch learned through Gregory Hersch and FCA that Franzone represented to FCA and to another registered investment advisor in May 2017 that he (Franzone) was "trading on the screens throughout all of the days" for the Fund. Hersch also learned that, as recently as August 2018, Franzone was informing potential investors in the Fund that the Fund's "strategy is generalist by asset class and investment strategy, and is roughly 60% income securities, mostly with strategies to add income and kickers over dividends, 10% equity, mostly producing income with dividends and options; 10% alternatives; 10% real estate; and 10% private investments." In the latter communication, Franzone included for the prospective investor a chart claiming that, from August 2010 to August 2018, the Fund had produced a compounded annual return of 11.66%. Indeed, according to the attachment, the Fund had never had a loss over any 12-month period in

its then 8-year existence. As detailed below, these representations and returns were and are false, but Defendants concealed the actual investment allocations and made up the performance figures.

35.    Franzone's artificial inflation of the Limited Partners' returns was crucial to his fraud. The relevant LP Agreement provides for two forms of compensation for the General Partner – both of which are based on the Limited Partners' capital accounts. First, depending on the Class of Limited Partner interest, the GP receives a 2% or 3% per annum "Management Fee" calculated on each Limited Partner's capital account. Thus, increases in the values of the Limited Partners' capital accounts increases the Management Fees. Second, the GP receives a "Performance Allocation" of 20% of each quarterly net profit so long as no Limited Partner has suffered a loss of his or her original capital. Since Franzone informed each Limited Partner that he or she suffered no losses, and in fact claimed the Limited Partners had achieved fictitious gains in the undisclosed investments, and further claimed that the Fund had never experienced losses over any 12 month rolling period since its inception, Franzone awarded himself numerous 20% Performance Allocations which he paid with cash capital contributed by Limited Partners, by borrowing in the name of the Fund and from liquidating Fund investments over time. Plaintiff estimates that, over the years, Franzone paid himself in excess of $10 million based on fictitious valuations of the Fund's investments.

**_Franzone's Fraud Unravels_**

36.    Hersch learned of Franzone's fraud through the investigatory efforts of FCA, the investment advisor to Hersch and to several other Limited Partners of the Fund. In late April 2019, another of FCA's clients that was also a Limited Partner (the "Skinners") raised concerns about the Fund's solvency. The Skinners' information was particularly reliable because they had been employed by Franzone for several years in a car racing venture called "ATF & Gunslinger" – the

10

"ATF" being Franzone's initials and the "Gunslinger" being the racing nickname of the professional driver. Franzone purported to fund ATF & Gunslinger's racing and social events as "team owner" through his earnings from the Fund's General Partner. The Skinners estimate that from 2014 through 2018, Franzone contributed $1 to $1.2 million per calendar year to ATF & Gunslinger's operations. A copy of the Affidavit of Angie Skinner in Support of Plaintiffs' Motion for Status Quo Order as was filed as an attachment to the complaint in the Delaware Action is annexed hereto as Exhibit B.

37.     Early on in his relationship with the Skinners, Franzone touted his skill at trading securities but [in the spring of 2019] he stated to them that he looked forward to "getting back" to trading, thus indicating that he was no longer doing so. In 2018, Ms. Skinner learned directly from Franzone that he had used an ATF & Gunslinger credit card to pay $70,000 to a private website design and digital marketing company called ACADACA LLC ("ACADACA") to which the Fund had loaned money and, further, that he was planning on using funds from ACADACA to buy a personal home near that of the Skinners in Florida. Franzone informed Ms. Skinner that the Fund lacked written evidence of the terms of its loans to ACADACA (*i.e.,* other than records of the actual transfers of money to it). Franzone allowed Ms. Skinner to listen in on a phone call that Franzone had with the founder of ACADACA, Jason Feingold, in which Mr. Feingold threatened to inform the Plaintiff and Gregory Hersch if Franzone pressed ACADACA for repayment.

38.     At racing events in early 2019, Franzone introduced the Skinners to a consultant that Franzone had hired for the Fund, who – in the hearing of Ms. Skinner – revealed disconcerting information about the Fund's investments and expenses. According to the consultant, the GP lacked proper documentation of the Fund's investments and was using hundreds of thousands of

dollars of Fund money to pay auditors, accountants and administrators for non-existent, duplicative or unnecessary expenses.

39.     Also in early 2019, the Skinners learned from Franzone that the Fund was "illiquid," that he was deferring his own management fees, and had borrowed $200,000 from his former girlfriend at an exorbitant interest rate. He admitted to the Skinners that he had not been trading on behalf of the Fund for two years.

40.     In March 2019, the Skinners held a meeting with both the Fund consultant and Franzone at the Skinners' house in Florida to discuss the information that they had recently learned about the Fund's investments and expenses. Prior to the consultant's arrival, Franzone requested a personal loan from the Skinners, which he stated that he could repay once the Fund sold certain condominiums that it owned. The Skinners requested collateral from Franzone in the form of titles on various exotic cars and trucks that Franzone supposedly owned personally, but Franzone stated that he had already pledged title to the cars to a lender that allowed him to keep driving the cars. Nevertheless, the Skinners agreed to lend Franzone $100,000. After the consultant arrived at the meeting, the Skinners learned that Franzone had caused the Fund itself to borrow $1 million at the usurious interest rate of 100% per annum, secured by Fund assets. Franzone later told the Skinners that he had used some of the Fund's proceeds from the condominium sales to pay off the $1 million loan and the accrued interest at 100%.

41.     In late April 2019, Gregory Hersch became aware of the Skinners' information and other information that led him to have concerns about Franzone's activities.  Accordingly, Gregory Hersch demanded a meeting with Franzone in which Franzone was to explain the Fund's investments and expenses. The meeting took place in FCA's office on April 30, 2019 and Franzone provided some additional materials to Mr. Hersch over the next two business days. Franzone

12

admitted to Mr. Hersch that the Fund had less than $10,000 in investments of the kind emphasized in the PPMs for Fund limited partnership interests (*i.e.*, income generating securities, options, preferred stock and other exchange-traded or liquid investments). Instead, the Fund had been lending money to or otherwise investing in dozens of small, privately-held companies or business ventures of Franzone's friends and associates.

42.     Franzone explained to Gregory Hersch that these private company "investments" were held in a Fund subsidiary called "F5", but was unable to produce documents memorializing the terms of most of the Fund's investments. Even for those few investments for which Franzone produced documents, they were either unexecuted or (in the case of ACADACA) are believed to have been contrived shortly before the meeting.

43.     In a series of text messages on May 23, 2019, Gregory Hersch asked Franzone to explain the lack of audited financial statements for the Fund for 2015 through 2018 and the inordinate delay in the release of audited financial statements for the year ended December 31, 2014. Franzone was unable to provide any rational explanation for the breach of the GP's duty under the LP Agreement to provide such audited financial statements to the Limited Partners within 90 days of the end of the Fund's Fiscal Year.

***Franzone's Fraud as Reflected through Examples of Bad Faith Valuations***

44.     Under the definition of "Fair Market Value" in the LP Agreement, illiquid Fund investments (*i.e.,* those not traded on any exchange or on the over-the-counter market) such as those purportedly held by Fund subsidiary F5 shall be valued based upon information available to the GP, including in the case of equity-like features of such investments a list of "observable inputs" described in the definition, such as earnings, cash flows and other company fundamentals.

45.     As discussed below, FCA's research into the F5 investments on behalf of Hersch and other of FCA's clients that are invested in the Fund reveals that, even if some of the investments can be proven to exist at all, the valuations that Franzone has placed on many of them as of March 31, 2019 are made in bad faith for the purpose of justifying fees previously paid to the GP and Franzone and with conscious disregard of observable inputs and other information known or obvious to Franzone that contradict those valuations.

a.      Global Energy & Power Recycling, Inc. ("GE&P"):   The GE&P website (until the summer of 2019 available at www.ge-p.com) described the company as "a privately owned and family operated New York city-based company" whose mission was "to develop environmentally responsible waste management solutions." The website did not contain any description of business activity later than a July 2013 meeting in connection with the potential construction of a truck-to-rail waste transfer facility in Long Island City, New York. The "Updates" link on the webpage contained no information other than the words "Coming Soon," suggesting that GE&P failed to obtain the project. According to information provided by Franzone to FCA, from May 2015 to July 2018, Franzone caused the Fund to loan GE&P $3,271,500 under a Note and Warrant Purchase Agreement dated April 29, 2015 that refers to the Long Island City construction project. GE&P has never repaid any part of the Fund's loan principal, nor has it paid any interest on it. The warrant states that it is void after April 29, 2017. Nevertheless, the Fund's investment has been fraudulently valued by Franzone as of March 31, 2019 at $5,853,482.00.

b.      Niosi Capital Partners II, LLC ("NCP II"):  Anthony Niosi is a car and gun enthusiast who is friendly with Franzone. According to documents provided to FCA by Franzone, over the period April 2013 to April 2017, the Fund's predecessor (Farrell Franzone, L.P.), the Fund and a Fund affiliate (F5 Business Investment Partners, LLC) made several loans totaling

$1,639,100.21 to an entity controlled by Niosi called Niosi Capital Partners LLC ("NCP_I") that held itself out as a private equity firm that invests in commercial real estate. Over that four-year period, the Fund received only $25,063.00 in interest on its over $1.6 million in credit plus assignment from NCP_I of $3,037.21 of dividends that NCP_I had received from an investment in a company named LANDC Investments, LLC ("LANDC") that NCP_I had made with $200,000 of the borrowed money. In or around July 2017, NCP_I retained a placement agent to raise capital for a prospective real estate joint venture in which NCP_I would be the general partner. Instead of including the Fund or its affiliate in that joint venture either through NCP_I or otherwise, in April 2017, Niosi formed a new company, NCP_II, with F5 Business Investment Partners, LLC—each as a 50% member. In August 2017, Franzone—on behalf of Farrell Franzone, L.P., the Fund, and F5 Business Investment Partners, LLC (collectively, the "Fund Entities")—executed a "Settlement and Exchange Agreement" with Niosi, on behalf of both NCP_I and NCP_II, in which the Fund Entities released NCP_I from all obligations to them in exchange for (i) NCP_II's "Unsecured Subordinated Term Promissory Note" in the principal amount of $1,435,000 (the "NCP_II Note"), (ii) assignment of NCP_I's $200,000 investment in LANDC plus two dividends from LANDC formerly received by NCP_I in the total amount of $1,164.48 and (iii) the previously-acquired 50% membership interest in NCP_II. Not only is NCP_II's Note to F5 Business Investment Partners LLC unsecured and subordinated to future debts that NCP_II might incur, it does not mature until June 30, 2037 (20 years from its making), accrues simple interest at the rate of only 3.25% per annum and, at the election of NCP_II, the interest may be paid in the form of additional promissory notes of NCP_II on the same terms (*i.e.*, unsecured and subordinated) as the primary note. Despite the unfavorable terms and risk in the 20-year $1,435,000 NCP_II Note and the uncertain business prospects of NCP_II itself, Franzone fraudulently valued the Fund's investment

15

NCP_II as of March 31, 2019 at $8.3 million. By email to Gregory Hersch on May 3, 2019, Franzone attributed (without any supporting materials whatsoever) $7.0 million of that value to a 50% membership interest in NCP_II and the balance the NCP II Note.

          c.      <u>Acadaca LLC ("ACADACA")</u>:  ACADACA describes itself on its website as a boutique service for "turnkey ecommerce solutions," including website design and digital marketing. From December 2015 to June 2018, the Fund advanced more than $7.7 million to ACADACA. Of this total, it apparently advanced $1,345,000 from June 2015 to February 2017 with no repayment. (According to 2016 documents provided by Franzone to Gregory Hersch, ACADACA understood, at least as to a portion of the advance, that "Andrew doesn't care if it gets paid, it can accrue and 'off-the-record' he's going to do an equivalent amount of business with Acadaca.")  From June 2017 to June 2018, roughly every month, the Fund advanced cash to ACADACA and ACADACA returned some cash to the Fund. As of June 2018, the Fund seems to have made net advances to ACADACA of $3,208,420. Franzone claimed to Ms. Skinner and to Gregory Hersch that ACADACA issued the Fund a so-called "equity kicker" in the form of an LLC membership interest. As noted above, however, Franzone told Ms. Skinner that there were no contemporaneous writings with ACADACA establishing a committed lending relationship, repayment terms or the Fund's membership interests in ACADACA. Ms. Skinner was also a party to a telephone conversation between Franzone and the founder of ACADACA, Jason Feingold, in which Feingold threatened to communicate directly with Hersch (with respect to Hersch's individual investments in the Fund and the Trust's investment in the Fund) about Franzone's and the Fund's informal side-deals with him and ACADACA. In yet another example of such dubious dealings, by e-mail dated August 12, 2018 to Feingold, Franzone offered to "waive the repayment of some or potentially all of the Acadaca debt if my gain on Global InterXchange is about $15

million or some other amount we both agree on." Upon information and belief, Global InterXchange is a separate Fund investment that is not affiliated in an ownership or control sense with ACADACA. From conversations Hersch had with Ms. Skinner (who was a party to a prior phone call between Franzone and ACADACA's co-founder and CEO, Jason Feingold), it is understood that ACADACA asserts that these documents are not representative of the true financial arrangements between the Fund and ACADACA. Franzone fraudulently values the Fund's "investment" in ACADACA as of March 31, 2019 at slightly less than $8 million.

        d.    <u>Aldwych Capital Partners, LLC ("ACP")</u>:  According to its website, ACP is an investment advisor "on emerging market private credit, equity and special situations opportunities." In May 2019, Franzone provided Gregory Hersch with a short cover e-mail and single page attachment from a James W. Avery of ACP dated January 8, 2019, in which Avery summarized F5's "accumulated funding" of ACP through a promissory note totaling $1,528,000.00 over the period April 15, 2015 to December 15, 2018 and accrual of "pay-in-kind" interest of only $19,975 thereon in the same period. There is no indication of the maturity date for the note. The single-page attachment also purports to value F5's "equity" in ACP at $3,328,218 without describing how F5's equity interest is held or how the ACP valuation was performed (other than Avery's cover e-mail claiming that ACP had "experienced a substantial material increase in value" due to recent business developments). Even if the conclusory information provided were credible, the communication from ACP valued the note, interest and equity in total at $4,876,193. Without justification and in bad faith, Franzone fraudulently inflated the alleged value of the ACP investment as of March 31, 2019 to $5,856,193 – almost $1 million higher than ACP had itself estimated only months earlier.

     e.    <u>MiMedia Inc. ("MiMedia")</u>:  MiMedia is an online, cloud-based back-up service. The Fund apparently loaned MiMedia roughly $85,000 and subscribed for $340,000 of its preferred stock, for a total investment of roughly $425,000. On March 13, 2019, MiMedia advised Franzone that "it is very likely that the Term Loan will remain your best and only vehicle for a return." With accrued interest, the Fund's term loan balance is roughly $96,600, yet Franzone fraudulently values the Fund's investment as of March 31, 2019 at $483,637 -- an overstatement of more than $387,000.

     *f.*    <u>Waves Technologies Limited ("Waves")</u>:  Waves was a holding company registered in the Channel Islands that operated a Guernsey-based air taxi service. Franzone apparently caused the Fund to invest in Waves, but it is not clear how much he invested or what Waves issued to the Fund in exchange. Franzone valued the Fund's investment as of March 31, 2019 at $254,899.70. According to public news reports, in June 2018 the company's operating subsidiary suspended its operations, promising to resume in September 2018. The company never relaunched and on September 14, 2018 it announced it was liquidating. Franzone has provided no explanation for continuing to fraudulently value the Fund's investment in Waves at more than a quarter of a million dollars.

***Franzone's Fraud as Exemplified by the Fund's Apparent Insolvency***

    46.    While Hersch has reason to believe that Franzone attracted at least $40 million of investments in the fund, the CRO's Interim Report paints a dismal picture of the Fund's financial condition. A copy of the CRO's Interim Report (the "Interim Report") is annexed hereto as Exhibit C.

- The combined bank balances of the Fund and all of its subsidiaries as of September 9, 2020 was $1,045,528. Interim Report at p. 4, para. 21.

- Despite this paucity of cash, the Fund and its subsidiaries maintained 81 separate bank and brokerage accounts, Interim Report at p. 7, para. 19, yet the Interim Report makes no mention whatsoever of any historical securities trading.

- When it entered bankruptcy the Fund owned no liquid securities other than four hedge fund investments worth an aggregate of roughly $280,000 (the CRO redeemed three of the investments for aggregate proceeds of approximately $175,000, which is included in the combined bank balance mentioned above).

- A majority of the Fund's current investments "consist mainly of (i) illiquid, non-tradeable privately held shares in early stage or start-up companies, (ii) minority interests in real estate partnerships, or (ii) unsecured promissory notes with long term maturities. . . ." Interim Report at p. 4, para. 10. The CRO will not hazard a guess as to their value.

- Nine investment counterparties have made capital call demands for approximately $4.4 million in aggregate, but the Fund has no resources to meet these demands.

- On information and belief the CRO and the Fund's bankruptcy professionals have accrued at least $1 million of fees to administer the bankruptcy case.

47.     The CRO's Interim Report paints an equally damning portrait of Franzone's mismanagement of the Fund's corporate housekeeping.

- The Fund lacked a central repository of records, either electronically or in hard copy. Interim Report at p. 6, para. 16.

- The corporate records the CRO came into possession of were "fragmented and incomplete." Multiple name changes "add[ed] to the complexity of the corporate structure. At times, [the CRO] and the Fund's bankruptcy professionals "had to rely

on records/documents produced by third parties to ascertain the various ownership interests, name changes and current structure. Even after numerous attempts, the CRO was unable to obtain records from the Fund's own auditor and tax consultants, its registered agent, and "various other Service Providers." Interim Report at p. 5, para. 13.

- Franzone apparently has refused to authorize the Fund's principal accounting firm (which apparently acted for the GP), to turn over the GP's QuickBook files and other financial records related to the Fund, and that firm has refused to comply with the Fund's subpoena under Bankruptcy Rule 204.

- Franzone used a web of "service providers" "to aggregate, organize, and manage" the Fund's data and records, expending "significant amounts in fees" to them for "duplicative and redundant" work. Interim Report at p. 6, para. 14-15.

48.     From the time of his investment in 2012 to the present, Hersch had made a total capital contribution of $1.1 million in limited partnership interests in the Fund.

49.     During this time, Hersch never received any distributions, or payments otherwise, on his contributions to the Fund, despite Franzone's (now known to be fraudulent) continuous assertions and falsified documentation showing that Hersch's investment had appreciated substantially.

50.     As a result of Franzone's series of fraudulent and wrongful actions, directly and indirectly through the GP, Hersch has suffered damages not only in the amount of his total $1.1 million capital contribution, but also including any interests, distributions, appreciation, or payments otherwise due.

51.     Hersch's damages are further exacerbated due to Franzone's actions which caused the Fund and the GP to become reprehensibly insolvent, thus exponentially increasing the cost that Hersch must undertake to reclaim what is his.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement of Hersch as to the Fund)**

52.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

53.     Franzone induced Hersch to invest and purchase securities from him by explicitly misrepresenting trading profits, trading and investment strategies for the Fund, the Fund's AUM, and the value of its investments, as discussed below.

54.     In PPMs and in oral and written representations both before and after the PPMs, Franzone intentionally made material representations directly to Hersch and indirectly through the Hersch's investment advisor, FCA, regarding the trading and investment strategy for the Fund generally and Hersch's capital in the Fund specifically.

55.     In particular, Franzone overstated the Fund's AUM and the number of its investors, and represented that he would and did primarily trade in liquid, marketable securities on behalf of the Fund and that only a small portion of the AUM was invested in or with privately-held companies or ventures, and that the Fund was and always would be sufficiently liquid to redeem all or a part of Hersch and the Trust's investment on demand. Franzone further represented in e-mails and account statements that the Fund had on a twelve-month rolling basis unfailingly realized profits from trading and that Hersch's interests in the Fund had appreciated accordingly.

56.     Franzone's representations were intentionally and materially false and/or intentionally omitted facts necessary to make the representations not materially misleading in that Franzone knew that he was not trading in such liquid, marketable securities but was instead (a)

21

lending or investing substantially all of the Limited Partners' capital, including that of Hersch, to or in privately-held companies or ventures, many of which were controlled by friends and acquaintances of Franzone and (b) artificially inflating the value of such investments to create an illusion of positive Fund performance upon which he based his fees.

57.    Hersch justifiably relied on Franzone's material misrepresentations and omissions in making his initial and later investments in the Fund and in holding those investments over several years. Hersch made capital contributions to the Fund totaling $1.1 million.

58.    Hersch would not have made any initial or subsequent capital contributions to the Fund and, thereafter, would have demanded return of those contributions and any profits thereon if he had known the truth of Franzone's investing activity. Hersch has also suffered losses of his capital contributions as a proximate result of his reliance on Franzone's intentionally and materially false representations and omissions.

59.    Franzone made these representations aware of their falsity, but made these representations because he knew that the only way to induce Hersch to enter the transaction was by making such representations regarding the Fund and its management.

60.    Hersch believed and justifiably relied on the statements made by Franzone in purchasing securities from and investing with Franzone.

61.    Because of the reliance on Franzone's representations, Hersch has suffered and will continue to suffer. Hersch is entitled to recission of his capital contributions in an amount to be determined at trial for losses of capital and capital appreciation proximately caused by Franzone's fraud.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty as Manager of Fund's GP)

62.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

63.     Defendant Franzone is the Manager of the Fund's GP, FF Fund Management LLC.

64.     The PPM describes Franzone as the "principal" and "founder" of the GP and the GP as "controlled" by Franzone.

65.     As the Manager of the Fund's GP, Franzone owes fiduciary duties to Hersch, an investor since 2012.

66.     Franzone has ignored the formalities of Delaware law in his operation of the GP and has used his control of the GP to cause it and the Fund to support Franzone's personal financial dealings in the racing business with the Skinners, ATF & Gunslinger, his personal real estate transactions and his individual lifestyle.

67.     On information and belief, Franzone has commingled and transferred money indiscriminately and without justification among and between banking accounts in the name of the Fund (or its subsidiaries), the GP and himself individually.

68.     Hersch is entitled to a declaration that Franzone breached his fiduciary duties and is individually and personally liable for the debts of the GP to the Fund and for the debts of the GP to Hersch.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duties Owed to the Partnership and to Hersch as Limited Partner)

69.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

70.     As GP of the Partnership and principal of the GP, Franzone owed fiduciary duties to both the Partnership and each of its Limited Partners, including Hersch. By virtue of his relationship with Hersch, Franzone, acting in his individual capacity selling securities, owed Hersch a duty to act honestly, faithfully, diligently, carefully, and in a manner that would otherwise promote Hersch's best interests.

71.     Franzone violated his fiduciary duties by, among other things, falsifying investment returns of the Partnership and of Hersch as a Limited Partner, taking management and performance fees based on bad faith claims of unrealized "gains" in his valuation of unmarketable investments, using the AUM for personal purposes, repeatedly misrepresenting the true value of the AUM and inflating its figure to further mislead and induce Hersch into further investigating into the Fund, informally lending or transferring Fund assets on long-term, below-market rates to private companies and ventures controlled by friends and associates of Franzone without proper documentation of the loan to, or other interest of the Fund in, the company or venture, wasting Fund assets through the retention and payment of duplicative, unnecessary or non-performing administrators, accountants, auditors, lawyers and other professionals in the hope of generating referrals of additional investors, and borrowing money in the name of the Fund at usurious interest rates.

72.     As a consequence of the foregoing, Hersch has suffered and will continue to suffer harm.

### FOURTH CAUSE OF ACTION
### (Breach of Limited Partnership Agreement)

73.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

24

74.     Section 5.6 of the LP Agreement provides that the Management Fee due quarterly to the General Partner is based on percentages of the Capital Account balances of the various classes of Limited Partners as of such quarter. Sections 3.1 and 3.2 of the LP Agreement provide that each Limited Partner's Capital Account is based on his, her or its initial capital contribution, additional capital contributions and withdrawals and each such Limited Partner's "Net Profit" or "Net Loss" for each Accounting Period.

75.     Section 3.2(b) of the LP Agreement provides that any Performance Allocation made to the General Partner is based on the existence of "Net Profit" for an Accounting Period.

76.     "Net Profit" and "Net Loss" as defined in the LP Agreement, with regard to any Accounting Period, are determined by examining the "Class Net Asset Value" of each class of Limited Partner interests at the beginning and close of that Accounting Period. Class Net Asset Value is, in turn, defined in the LP Agreement as consisting of, among other things, the "Fair Market Value of the Class' investments."

77.     Thus, both the GP's Management Fee and Performance Allocation is based on Net Profits, which in turn, is a function of the "Fair Market Value" of the investments attributed to each Class of Limited Partner interests.

78.     For investments that are "not listed or traded on any exchange or on the over the counter-market," such as the F5 investments described above, the General Partner is required to value them at "fair value based on information available to the General Partner" which shall include the "ability" to mark fixed income portions of the investment at cost plus accrued and/or realized dividends and/or interest income plus "in the sole discretion of the General Partner," a separate fair value figure for the unrealized portion of the warrant or equity-like feature of the investment (if any) based on one or more factors including "observable inputs, company prospects,

recent financing rounds, multiples applied to known or estimated company fundamentals such as earnings, cash flows or other valuation metrics specific to that company . . . ."

79.     Franzone violated the LP Agreement's above definition of Fair Market Value and the law of Delaware which implies a contractual duty of good faith and fair dealing in the "ability" of a General Partner to value investments in the General Partner's "sole discretion" in the calculation of the fair market values of the investments of the Fund and its F5 subsidiary by consciously disregarding "information available to the General Partner" about the investments that contradicted the valuations that Franzone had placed upon those investments.

80.     Franzone performed his valuations in bad faith for the purpose of artificially inflating the Management Fee and the Performance Allocations that he reported and paid himself over the years of the Fund's operation.

81.     Hersch is entitled to damages in the amount of his portion of the overpayments of Management Fees and Performance Allocations to the General Partner.

82.     The General Partner has also breached Section 7.4 of the LP Agreement which requires it to "furnish audited financial statements [of the Partnership] to all Limited Partners within 90 days, or as soon thereafter as is reasonably practicable, following the conclusion of each Fiscal Year."  The most recent audited financial statements that exist for the Fund are for the year ending December 31, 2014 and the auditors' report thereon was not issued until March 14, 2018.

83.     Text messages from Franzone to Mr. Gregory Hersch dated May 23, 2019 demonstrate that the GP had no reasonably practicable reason for the delay.

84.     As a consequence of the foregoing, Hersch has suffered and will continue to suffer harm.

## FIFTH CAUSE OF ACTION
### (Common Law Fraud)

85.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

86.     This claim is for common law fraud against Defendant Franzone.

87.     The material misrepresentations set forth above were fraudulent, and Franzone's representations fraudulently omitted material statements of fact.

88.     Franzone knew his misrepresentations and omissions were false and misleading at the time they were made. Franzone made the false and misleading statements and omissions with the intent to defraud investors like Hersch. Indeed, Franzone made fraudulent misrepresentations and omissions directly to Hersch through statements regarding the value of the investments, financials, revenues, profits and losses and related topics during the relevant period.

89.     Hersch justifiably relied on Franzone's false and misleading representations and omissions.

90.     Had Hersch known the relevant true facts regarding, among other things, the value of the Fund's investments, the Fund's actual AUM, the actual number of the Fund's investors, and the Fund's revenues, profits and losses, operations, business and prospects, all which Franzone misrepresented or concealed, Hersch would not have invested with Franzone.

91.     As a result of Franzone's false and misleading statements and omissions, as alleged herein, Hersch has suffered damages according to proof.  Franzone is liable to Hersch for common law fraud.

## SIXTH CAUSE OF ACTION
### (Alter Ego/Piercing Corporate Veil of FF Fund Management LLC)

92.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs as if fully incorporated herein.

27

93.     FF Fund Management LLC, the GP, is not a properly organized limited liability corporation.

94.     Franzone has fraudulently used the GP to perpetrate a fraud on its Limited Partners and the Fund.

95.     At all relevant times in which Franzone used the GP to perpetrate his fraud, the GP was a mere instrumentality of Franzone. Franzone exercised complete domination over the GP, such that the GP had no separate will of its own. Franzone's complete domination over the GP was used to commit a fraud and wrong against Hersch.

96.     The GP was, at all relevant times, insufficiently capitalized for purposes of corporate undertaking. Presently, the GP is insolvent. This insolvency is evidenced by the fact that (i) the GP caused the Fund to borrow at least $1 million at an interest rate of 100% per annum, and (ii) the GP's principal, Franzone, has had to obtain personal loans from the Skinners, his former girlfriend, and from a lender to whom he pledged his car collection.

97.     The GP observed little or no corporate formalities. Franzone has used his control of the GP to cause it and the Fund to support Franzone's personal financial dealings in the racing business with the Skinners, ATF & Gunslinger, his personal real estate transactions and his individual lifestyle. The GP was used by Franzone as merely a façade for his personal dealings.

98.     As a direct and proximate result of Franzone exercised complete domination over the GP in the GP's commission of the fraud, Hersch suffered damages.

99.     For the reasons above, the GP's principal, Franzone, must be personally liable for the GP's actions.

## **PRAYER FOR RELIEF**

100.    WHEREFORE, Plaintiff, respectfully request that the Court:

a.      Award damages in an amount to be proven at trial;

28

b.      Award Plaintiff his costs, including reasonable attorneys' fees; and

c.      Punitive damages; and

d.      Award all available pre-judgment and post-judgment interest, to the fullest

extent available under law or equity from the date of service of the initial

complaint in this action;

e.      Order such further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all

issues so triable.

Dated: October 28, 2020

Respectfully submitted,

/s/ Brad. J. Axelrod
David H. Wollmuth
Brad J. Axelrod
Olivia J. Italiano
Baron C. Giddings

WOLLMUTH MAHER & DEUTSCH LLP

500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
baxelrod@wmd-law.com
oitaliano@wmd-law.com
bgiddings@wmd-law.com

*Attorneys for Plaintiff Dennis S. Hersch*